The UNITED STATES

v.

Henry Clay COLLINS.

Crim. No. 74–165.

United States District Court,
M. D. Pennsylvania.

April 25, 1975.

---

Michael McDowell, Asst. U. S. Atty., Lewisburg, Pa., Sal Cognetti, Jr., Asst. U. S. Atty., Scranton, Pa., for plaintiff.

John M. Humphrey, Ronald C. Travis, Williamsport, Pa., for defendant.

## MEMORANDUM AND ORDER

NEALON, District Judge.

Now before the Court are defendant's post-trial motions for a judgment of acquittal or, in the alternative, for a new trial which were filed subsequent to his conviction by a jury on January 10, 1975 of second-degree murder in violation of 18 U.S.C. § 1111.[1] Defendant, an inmate at the United States Penitentiary at Lewisburg, Pennsylvania, together with Harold Thomas Smith, also an inmate at the Lewisburg Penitentiary, were indicted on September 24, 1974 for the first-degree murder of another inmate, Robert Artemus Burkeen, on July 25, 1974. On January 3, 1975, this Court granted the defendant Collins' motion for a severance of parties, and on January 6, 1975, Mr. Collins' trial commenced at the United States Courthouse in Lewisburg. On the fifth day of that trial, January 10, the aforementioned verdict was returned by the jury. According to the government's evidence, defendant fatally stabbed Burkeen in a homosexual dispute over the attentions of Smith. The murder weapon was a piece of metal, approximately 10 inches long, that had been honed to a point and one end covered with masking tape to resemble a handle. The evidence revealed that Smith and the defendant met Burkeen in the prison library in order to tell him to stay away from Smith but that Burkeen protested. As the trio left the library and descended the stairs, the defendant stabbed Burkeen in the back and in the abdomen. Burkeen was rushed to Geisinger Medical Hospital, Danville, Pennsylvania, where he died less than two hours later. Inmate eyewitnesses testified to seeing defendant raise the knife in his right hand and plunge it into Burkeen. Two other inmates testified that subsequent to the offense and while in segregation, defendant admitted that he "made my move" as they went down the steps and ". . . jumped on the guy and killed him." Without reviewing the evidence in detail, it is noted that there was an abundance of corroborative and incriminating testimony in support of the government's case. In his testimony, the defendant admitted that he did the stabbing but contended it was done in self-defense. The jury obviously rejected this defense and found the defendant guilty of murder in the second degree.

Defendant has assigned two grounds in support of his motion for judgment of acquittal and several bases for his motion for a new trial. They will be ad-

---

1. "(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

"Any other murder is murder in the second degree.

"(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment', in which event he shall be sentenced to imprisonment for life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life." 18 U.S.C. § 1111.

dressed in the approximate order raised by defendant, with the facts relevant to each issue being recited in conjunction with the discussion of the issue at hand.

## JUDGMENT OF ACQUITTAL

■ In support of his motion for judgment of acquittal, defendant argues first that the government failed to prove an essential element of the offense, namely, that the crime was committed "[w]ithin the special maritime and territorial jurisdiction of the United States," 18 U.S.C. § 1111(b), or, as phrased in the indictment in this case, "on lands acquired for the use of the United States of America and under the exclusive jurisdiction thereof[.]" Defendant does not argue that the evidence was insufficient to establish that the crime was committed within the jurisdiction of the United States but that the government simply neglected to affirmatively prove that the offense was committed within that jurisdiction. While it is true that the government's attorney did fail to introduce evidence at trial for the specific purpose of establishing the jurisdictional element of the offense, it is also true that jurisdiction was in no way controverted during the trial,[2] and that there was abundant circumstantial evidence during the trial that the offense occurred on federal property.[3] Under these circumstances, I agree with the Court in Schoppel v. United States, 270 F.2d 413 (4th Cir. 1959), where the identical issue was raised under jurisdictional circumstances substantially the same as those in this case:

"Where the fact was in no way controverted at the trial, we think that the testimony of the witness Paul F. Pegelow was adequate to prove the court's jurisdiction over the situs of the offense, if indeed the matter was not one for judicial notice. He testified that he has served as Superintendent of the Lorton Reformatory for thirty-four years and that it is a government reservation. We adopt the all sufficient answer returned by Mr. Justice Holmes when the identical point was raised in Holt v. United States, 1910, 218 U.S. 245, 252, 31 S.Ct. 2, 54 L.Ed. 1021 . . . ., namely, that the United States is not called on to try title in a murder case." Id., at 418.

■ Defendant's second argument in support of his motion for a judgment of acquittal[4] borders on the frivolous.

---

2. Prior to the trial the Court talked to both counsel in a telephonic conference call and was of the impression that the parties were agreeable to a stipulation that the offense was committed at the United States Penitentiary on lands acquired for the use of the United States. Defense counsel, while conceding that there was an understanding between counsel to attempt to reach some stipulations, does not recall any discussion or agreement concerning a stipulation as to territorial jurisdiction. Had it not been for that assumption, the Court would have submitted it to the jury as a disputed fact. It should also be noted that defense counsel made no exception to the charge on this point. Nevertheless, the facts of this case with respect to jurisdiction are substantially the same as in Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), in which the Court, speaking through Mr. Justice Holmes, termed the defendant's argument that federal jurisdiction had not been established "an attempt to raise technical difficulties about a fact which no one really doubts; namely, that the band barracks, the undisputed place of the crime, were within the exclusive jurisdiction of the United States." Id., at 252, 31 S.Ct. at 6.

3. For example, three eyewitnesses to the offense, all of whom were inmates at Lewisburg Penitentiary at the time, testified that they witnessed the crime as it occurred in a stairwell adjoining the library of the penitentiary.

4. Defendant asserts that this ground is a basis for an arrest of judgment. However, it is not a proper ground for an arrest of judgment, which may only be granted "if the indictment or information does not charge an offense or if the court was without jurisdiction of the offense charged." Rule 34, Federal Rules of Criminal Procedure. In addition, the defendant never made a motion for arrest of judgment. Accordingly, I will treat the ground as being in support of the motion for judgment of acquittal. In addition, this ground is also offered in support of the de-

It derives from the fact that subsequent to the conviction in this case, on March 7, 1975, as the result of a plea bargain, codefendant Harold Thomas Smith entered a plea of guilty before this Court to an information charging him with being an accessory after the fact to the voluntary manslaughter of Burkeen. The murder indictment against Smith was subsequently dismissed. Defendant argues that, as a result of Smith's plea, it would appear that since his (Collins') trial the government has obtained additional information establishing that the killing of Burkeen was at most voluntary manslaughter, and that, accordingly, it is manifestly unfair that the defendant should be accountable for murder in the second degree.

■■■ Defendant misperceives the significance of the disposition of criminal charges by agreement between a prosecutor and an accused. Such a disposition has been termed by the Supreme Court "an essential component in the administration of justice." Santobello v. New York, 404 U.S. 257, 260, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971). While the factors that may enter into the decision of either a defendant or a prosecutor to strike a plea bargain are numerous and diverse, essentially such an agreement represents an exchange of benefits by the parties involved. A defendant who enters a plea affords the government an opportunity to insure prompt and certain application of correctional measures while avoiding the costs and uncertainties of a trial. The government, on the other hand, usually offers the defendant a reduction in the charge against him, and often a sentencing recommendation as well. Such an offer by the government is by no means an admission that the underlying crime amounts to nothing more than the charge to which the defendant will be permitted to plead. It is rather an exercise in prosecutorial discretion. Such

discretion is "exceedingly broad," United States v. Bell, 506 F.2d 207, 222 (D.C. Cir. 1974), and may permit the filing of different charges against "[t]wo persons [who] may have committed what is precisely the same legal offense[.]" Newman v. United States, 127 U.S.App. D.C. 263, 382 F.2d 479, 481–482 (1967). In the instant case, in view of the evidence adduced at Collins' trial, which indicated that the government's case against Smith was not as strong as its case against Collins, the exercise of prosecutorial discretion represented by the plea agreement with Smith seems particularly appropriate. Moreover, the plea bargain was discussed extensively in open court and there was no indication from either side that additional information had surfaced concerning the circumstances of the crime.

■■■ Furthermore, such a view of plea bargaining is not inconsistent with the mandate of Rule 11, Federal Rules of Criminal Procedure, that "[t]he court shall not enter a judgment upon a plea of guilty unless it is satisfied that there is a factual basis for the plea." "[F]actual basis" does not mean factual identity. It means instead that "[t]he court should satisfy itself . . . that the conduct which the defendant admits constitutes the offense charged . . . or an offense included therein . . . ." Notes of the Advisory Committee to the 1966 Amendment to Rule 11, Federal Rules of Criminal Procedure. In the case at hand, this Court's satisfaction that the conduct admitted by Harold Thomas Smith formed a sufficient factual basis for his plea to being an accessory after the fact to the voluntary manslaughter of Burkeen does not mean that the underlying crime did not exceed voluntary manslaughter, but rather that it was at least voluntary manslaughter. Defendant's argument to the contrary must be rejected.

---

fendant's motion for a new trial. For the same reason that it does not warrant a judg-

ment of acquittal, see *infra*, the argument also does not justify the granting of a new trial.

■■■

## NEW TRIAL

■ The first ground offered in support of the motion for a new trial is that this Court erred in refusing to grant the defendant's pretrial motion for a psychiatrist's reexamination to determine his mental competency to stand trial. By order of this Court pursuant to 18 U.S.C. § 4244, the defendant was initially examined by two psychiatrists on November 1, 1974, both of whom submitted reports to the Court indicating that in their opinion the defendant was mentally capable of understanding the proceedings against him and of assisting in his own defense. On the basis of these reports, the Court concluded that the defendant was mentally competent to stand trial. Thereafter, on November 29, 1974, the defendant moved under 18 U.S.C. § 4244 for a reexamination to determine his mental competency to stand trial. The sole ground offered in support of the motion for reexamination was the inadequacy of the examination conducted on November 1.[5] The motion alleged no facts, observed since the first examination, indicating possible incompetence. As the Court found no reason to question the adequacy of the two psychiatrists' examination of the defendant, the motion was denied on December 18, 1974. The defendant now argues that the Court erred in denying the motion.

■■ Once a psychiatric examination pursuant to 18 U.S.C. § 4244 has been conducted, a motion for reexamination is addressed to the discretion of the Court. United States v. Cook, 418 F.2d 321, 324 (9th Cir. 1969). Whether a second examination is required depends on the factual allegations of the motion and the amount of time that has elapsed since the initial examination. *Id.* Generally, the courts have been reluctant to grant motions for reexamination under 18 U.S.C. § 4244, particularly where, as in this case, little time has elapsed since the first examination, no new facts indicating possible incompetency are alleged in the motion for reexamination, and the only ground offered in support of the motion is the alleged inadequacy of the first examination. *Id.*; United States v. Taylor, 437 F.2d 371, 376 (4th Cir. 1971).[6] In addition, defendant's allegation that the examination was inadequate is not persuasive in light of the reports of the two psychiatrists who examined him, both of which indicate that the examination was thorough and sufficient to furnish a basis for determining the defendant's competency to stand trial. Furthermore, there is no representation by defense counsel that de-

---

5. The reasons given by the defendant were (1) that one of the doctors had conversed with the United States Marshal who accompanied the defendant to the examination; (2) that the examination conducted by one of the doctors lasted only approximately ten minutes; and (3) that there was no indication in the reports filed by the doctors that they had considered the defendant's past medical history in arriving at their conclusions. These reasons furnish no ground for questioning the adequacy of the examination of the defendant. In the first place, there was no allegation that the doctor's conversation with the marshal was in any way improper. Moreover, only one of the two interviews was alleged to have been too short, and even the amount of time of that interview, 10 minutes, has been held to be an adequate period of time within which to determine a defendant's competency to stand trial. See United States v. Taylor, 437 F.2d 371, 376 (4th Cir. 1971). Finally, the alleged failure to consider the defendant's past medical history is not persuasive in view of the nature of the reports submitted by both doctors to this Court, both of which indicate that the examinations were thorough and more than adequate to determine the defendant's competency to stand trial.

6. In relying chiefly on the *Taylor* case in support of his argument, the defendant misreads the case. The examination in question there was a ten-minute interview by one doctor which ended abruptly when he was threatened by the defendant. The court held that that examination was sufficient to determine the defendant's competency to stand trial. ' The court did hold, however, that the examination was inadequate to furnish the defendant an opportunity to develop a possible defense of insanity, an issue not relevant here, as an insanity defense has never been raised by the defendant.

fendant was so mentally incompetent during the course of the trial as to be unable to understand the proceedings against him or properly to assist in his own defense. Indeed, defendant testified at great length concerning events leading up to the offense, the offense itself, and matters occurring subsequent thereto. He did not exhibit any traits of mental weakness or incompetency. In sum, the argument with respect to his motion for a reexamination under 18 U.S.C. § 4244 must be rejected.

Defendant next argues that a new trial is required because the Court erred in denying four of his challenges for cause during the voir dire of the jury array, thereby forcing him to use four of his peremptory challenges to remove those four potential jurors. With respect to the four potential jurors in question, the defense asserts that the voir dire questioning established that one of them knew two of the potential government witnesses (neither of whom actually testified); that two others each had one personal acquaintance who worked at the Lewisburg Penitentiary, and that the other had a son-in-law who was a guard at the penitentiary.[7] Nevertheless, all four assured the Court that they would be impartial and unbiased if selected as jurors, and would be able to reach a verdict based solely on the evidence presented at trial. Notwithstanding this, defendant maintains that the four potential jurors in question should have been removed for cause, in effect taking the position that their relationship to persons only peripherally involved with the trial constituted a *per se* cause for their removal.

The trial court has broad discretion to determine bias of potential jurors on challenges for cause. Frazier v. United States, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187 (1969); Government of Virgin Islands v. Williams, 476 F.2d 771, 775 (3d Cir. 1973). Particularly where there has been no showing of actual bias, the court's determination will not be upset. No such showing was made with respect to these four witnesses at the time of the voir dire, nor does defendant at this time point to anything indicating actual bias. His argument with respect to the challenges for cause is without merit. See Mikus v. United States, 433 F.2d 719 (2d Cir. 1970).[8]

The defendant's next argument is that the Court erred in denying his request to call an expert witness, Dr. Robert Buckout, to testify for the defense. It was represented to the Court at trial that Dr. Buckout, a practical clinical psychologist and professor at Brooklyn College of the City University of New York, has done extensive testing and research in the area of eyewitness testimony and the effect on the reliability of such testimony of such factors as the stress the viewer was under at the time he witnessed the event about which he testifies, the environment and physical conditions under which the activity was witnessed, and the tendency of many eyewitnesses to consciously alter their account of what they witnessed by "filling in" what they actually saw with what they thought they were seeing. The defendant's offer of proof suggested that Dr. Buckout would have testified about the results of his testing and research, and would have offered the opinion that,

---

7. The voir dire was not transcribed but the Court will accept defense counsel's recollection of what occurred.

8. Defendant's argument with respect to his challenges for cause is particularly meritless in view of the fact that he was afforded 20 peremptory challenges pursuant to Rule 24 (b), Fed.R.Crim.P. even though he was actually entitled to only 10 such challenges inas-

much as, because of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 272, 33 L.Ed.2d 346 (1972) as well as an agreement by the government prior to trial that death would not be a possible punishment in this case, the offense charged was not punishable by death. See United States v. Massingale, 500 F.2d 1224 (4th Cir. 1974); United States v. Freeman, 380 F.Supp. 1004 (D.N.D.1974).

as a result of the above-described factors and others, eyewitness accounts of incidents are not as reliable as most people would tend to believe. He would not have addressed himself to the testimony of the three eyewitnesses of the killing who actually testified on behalf of the government at the trial. Instead, he would have testified about the unreliability of eyewitness accounts in general in order to, in the language of the defendant's brief, give "defense counsel a basis, well founded in science, upon which to argue to the jury that the eyewitness accounts were inaccurate." Defendant's Brief in Support of Post Trial Motions, at 18. This Court refused to permit the testimony of Dr. Buckout, and the defendant now contends that this refusal was sufficient error to warrant the granting of a new trial.

 The test in this circuit for determining the competency of proffered expert testimony was expressed in United States v. 60.14 Acres of Land, 362 F.2d 660, 667 (3d Cir. 1966), where the court, quoting from Jenkins v. United States, 113 U.S.App.D.C. 300, 307 F.2d 637, 643 (1962), stated:

> " 'To warrant the use of expert testimony . . . two elements are required. First, the subject of the inference (which is to be drawn from the facts) must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman, and second, the witness must have such skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.' " .

In short, the subject must be a proper one for expert testimony, and the expert must be properly qualified. In addition, once it is determined that the expert testimony in question is competent, its probative value must be weighed against its prejudicial effect. United States v. Amaral, 488 F.2d 1148, 1152 (9th Cir. 1973). As with any evidence, if the potential for prejudice of competent expert testimony outweighs its probative value, it will not be admitted.

 Judged by those standards, the proffered testimony of Dr. Buckout in this case was properly rejected. Without deciding whether the subject matter of Dr. Buckout's testimony would have been a proper one for expert testimony, or whether Dr. Buckout is properly qualified to testify on that subject, I conclude, as I did at trial, that the potential prejudice of his testimony outweighed its probative value. To begin with, the probative value of the expert testimony would not have been significant. It is concede that Burkeen was stabbed by the defendant while in the stairwell, although the defendant contended that he acted in self-defense. Thus, the area of dispute is restricted to which one was the aggressor. Moreover, Dr. Buckout would have testified about something which is generally brought out by effective cross-examination at any trial—the factors, such as undue stress on the viewer and environmental conditions, which would tend to render a given eyewitness account unreliable, and the possibility or probability that the account in question is inaccurate. Defense counsel had ample opportunity to attack the eyewitness testimony in this case, and did so by attempting to point out alleged inconsistencies in the accounts offered at trial by the three eyewitnesses. In addition, counsel argued to the jury that because of those inconsistencies and other factors the accounts of the eyewitnesses should not be believed, and the jury was charged, at the defendant's request, about the vagaries of eyewitness accounts.[9] Dr. Buckout's testimony would

---

9. "Now, there has been eye-witness testimony here, Members of the Jury, and extensive comments made by defense counsel concerning it. Now, eye-witness identification testimony is an expression of a belief or impression by the witness. It is to be received with caution and scrutinized with care. You should consider the opportunity a witness had to observe that about which he has testified. You should consider any prior inconsistent

have done little more than add a scientific luster to the facts and ideas which were amply presented by cross-examination, counsel's argument to the jury and the charge of the Court.

Weighed against the limited probative value of that testimony is the substantial possibility of prejudice that it would have presented. To start with, the testimony adduced at the trial failed to reveal the existence in this record of those factors previously mentioned that usually form the basis for opinion evidence challenging the reliability of eyewitness testimony. Further, the proffered testimony would not materially assist the jury in analyzing the evidence in this case but would be directed to the expert's thesis that eyewitness accounts generally are not as reliable as one would believe. Consequently, there was a substantial risk that the credentials and persuasive powers of the expert would have had a greater influence on the jury than the evidence presented at trial, thereby interfering with the jury's special role as fact finder. Scientific or expert testimony particularly courts the substantial danger of undue prejudice or of confusing the issues or of misleading the jury because of its aura of special reliability and trustworthiness. United States v. Amaral, 488 F.2d 1148 (9th Cir. 1973);

United States v. Brown, 501 F.2d 146 (9th Cir. 1974). Therefore, considering all the circumstances of this case, I conclude that the probative value of Dr. Buckout's testimony was outweighed by its potentially prejudicial effect and was properly excluded.

 I have considered the remaining arguments in support of the motion for a new trial,[10] and conclude that they are without merit. Accordingly, defendant's motions will be denied.

---

statements as to identification or the details of the incident. You should consider the extent to which a witness' testimony was shaken or contradicted on cross examination or by other evidence. You should consider the emotion or the excitement of the moment and whether that interfered with the witness' ability to observe and to recollect. You should consider whether a witness did see all that he has testified to having seen, or did he supplement or fill in his testimony with details that he did not really see.

"You should consider whether a witness' testimony was influenced by rumors or by assumptions from others; and should consider all of the evidence in the case, Members of the Jury, and apply your good common sense in determining whether a particular witness' testimony is to be accepted by you.

"Now, eye-witness testimony is not infallible as it may be affected by the personality of the witness; the situation; by social pres-

sures; or by exposure to other accounts of the incident. It is up to you to determine if the doubts about an eye-witness' testimony, if you have any, are reasonable enough for you to reject the testimony as not true." Notes of Testimony, pp. 748–749.

10. They are: (1) this Court erred by not declaring a mistrial upon receipt of a note from a juror during the course of the trial that expressed concern about the safety of the inmate witnesses who were testifying on behalf of the government; (2) this Court erred by not permitting the defendant to testify concerning plea agreement negotiations that were held between him and the government prior to trial; (3) a portion of the government's cross-examination of the defendant went beyond the scope of direct examination; and (4) the testimony of two government witnesses was improperly admitted as rebuttal testimony.