PREGERSON, Circuit Judge,
concurring in part and dissenting in part [1]
The majority concludes that the California Supreme Court was not unreasonable in holding that Cunningham was not prejudiced by his counsel’s failure to present Dr. William Vicary, M.D., a psychiatrist, as a mitigating witness during the penalty phase of his trial. The majority reasons that Dr. Vicar/s testimony would have been duplicative and would have opened the door to a “damaging” rebuttal by a state expert.
In doing so, the majority fails to consider that this evidence would have gone directly to three of-the eleven factors the jury was required to consider in evaluating whether death or life without the possibility of parole was the appropriate sentence under California Penal Code § 190.3. Furthermore, without Dr. Vicary’s testimony, the jury was presented with no direct scientific testimony demonstrating that “at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to *1166 the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.” Cal.Penal Code § 190.3. Dr. Yicary’s testimony would have filled that gap. He would have explained that as a result of Cunningham’s horrific childhood, Cunningham was later unable to “conform his behavior to society’s norms.” Thus, Dr. Vicary’s testimony would have been the only scientific evidence directly demonstrating the “causal nexus” between Cunningham’s abusive childhood and his crime.
I would hold that, based on the record before it, the California Supreme Court unreasonably applied Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). I would thus grant Cunningham’s habeas relief on his penalty-phase ineffective assistance claim.
I.
“An ineffective assistance of counsel claim has two components: A petitioner must show that counsel’s performance was deficient, and that the deficiency prejudiced the defense.” Harrington v. Richter, -U.S.-, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011).
Under 28 U.S.C. § 2254(d)(1), a federal court may only grant a state prisoner ha-beas relief if the state court’s adjudication of the prisoner’s claim “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). Section 2254(d)(l)’s “unreasonable application” applies even where, like here, there has been a summary denial by the California Supreme Court. Harrington v. Richter, — U.S.-, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011). “Where a state court’s decision is unaccompanied by an explanation, the habeas petitioner’s burden still must be met by showing there was no reasonable basis for the state court to deny relief.” Id. To satisfy this standard, the petitioner must show that the state court decision was “objectively unreasonable,” not just incorrect or erroneous. Id. at 785.
II.Deficient Performance of Cunningham’s Counsel
Cunningham claims that his counsel was deficient because his attorneys failed to investigate or prepare a penalty phase defense. Specifically, he alleges that his attorneys failed to call a key expert witness, Dr. Vicary, to testify. The majority fails to discuss the deficiency prong, apparently conceding that Cunningham’s counsel was deficient. Thus, the only questions before this court are whether Cunningham’s counsel’s deficient performance prejudiced Cunningham and if so whether the California Supreme Court was unreasonable in finding a lack of prejudice
III.Prejudice & Unreasonable Application of Strickland by the California Supreme Court
Because we find Cunningham’s counsel deficient, we must determine whether the California Supreme Court unreasonably applied Strickland in holding Cunningham was not prejudiced by that deficiency. The prejudice prong of Strickland requires a showing that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. In California, however, to impose a death sentence, a jury must be unanimous; therefore, Cunningham need only demonstrate that, but for his counsel’s deficiency, there was a “reasonable probability that at least one juror would have” voted against sentencing Cunningham to death. Wiggins v. *1167 Smith, 539 U.S. 510, 537, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); CaLPenal Code § 190.4(b).
To assess that probability in a capital penalty phase proceeding, we must “reweigh the evidence in aggravation against the totality of available mitigating evidence.” Wiggins, 539 U.S. at 534, 123 S.Ct. 2527. That includes evidence “adduced at trial, and the evidence adduced in the habeas proceeding[s].” Williams v. Taylor, 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). However, “review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.” Pinholster, 131 S.Ct. at 1398. Accordingly, our review is limited to only the same evidence that was available to the California Supreme Court.
A. Cunningham was prejudiced by his counsel’s failure to call Dr. Vicary to testify because there is a reasonable probability that his testimony would have changed the jury’s verdict.
Had Cunningham’s attorneys called Dr. Vicary to testify and submitted his report into evidence, there is a reasonable probability that the testimony would have changed at least one juror’s vote. Dr. Vicary is a Diplómate of the American Board of Psychiatry and Neurology and a Diplómate of the American Board of Forensic Psychiatry. Over the past twenty-five years, he has been qualified as a scientific expert and has testified at about 500 trials regarding the mental health of criminal defendants. Scientific and expert testimony contains an “aura of special reliability and trustworthiness.” United States v. Amaral, 488 F.2d 1148, 1152 (9th Cir1973). Admissible expert testimony is meant to provide the jury with “appreciable help” in their determinations. Id. Here, Dr. Vicary’s testimony and report would offer an illuminating medical perspective on Cunningham’s behavior by shedding light on his prior convictions, substance abuse, traumatic family background, and mental illness. This evidence would have added significant mitigating weight by appreciably helping the jury to understand Cunningham’s mental capacity during his crimes.
Prior to drafting his ten-page medical report, Dr. Vicary met with Cunningham on six different occasions, spoke with Cunningham’s mother, reviewed police, autopsy, and recent psychological testing reports, and viewed Cunningham’s jail medical chart. From all this information, Dr. Vicary concluded that Cunningham suffered from a “chronic underlying depressive mental illness” for which alcohol was a “major exacerbating factor.” He further found that Cunningham has “longstanding serious psychiatric problems.” With regard to Cunningham’s traumatic family experience, Dr. Vicary noted that those experiences “caused a major impairment in his self-esteem.” He further found that Cunningham’s problems in school “led to additional negative experiences such as being rejected by peers.” Dr. Vicary reported that Cunningham’s “sense of unworthiness appears to have led him to sabotage his own success whether that occurred in treatment, work or interpersonal relationships.”
Dr. Vicary further noted that Cunningham has “[f]or many years ... suffered from symptoms of anxiety and depression” and that alcohol abuse “exacerbated his mental deterioration.” He noted that Cunningham would keep his “deeper thoughts and feelings to himself’ and “store frustrations until rare, aggressive outbursts,” usually triggered by alcohol, would occur.
Finally, although Dr. Vicary found that it “seems highly likely that [Cunningham’s] future adjustment in prison will be *1168 positive,” Dr. Vicary felt that without proper access to psychiatric treatment and medication in prison, Cunningham’s serious psychiatric problems “could culminate in a psychotic breakdown or suicide attempt.”
Dr. Vicary made this determination without any prior medical, psychological, social, or family history from Cunningham’s trial counsel. Had Dr. Vicary known more about Cunningham’s past, Dr. Vicary stated that he would have done further inquiry into Cunningham’s potential brain damage. He would have administered a Wexler Adult Intelligence Test and Reitan test. Depending on the result, he would have then ordered a “full battery of neuropsychological testing.”
Nevertheless, if called as a witness, in addition to the conclusions from his report noted above, Dr. Vicary would have explained “the negative effects of experiencing such a dysfunctional family life as a child and would have been able to provide some context and explanation for Mr. Cunningham’s later apparent inability to conform his behavior to society’s norms.” He would have further testified that “there is an increased chance of substance abuse in families where there is a pattern of alcoholism ... [and] [w]ith [Cunningham’s] family history, [Dr. Vicary] would have been able to put Mr. Cunningham’s alcoholism and other substance abuse in a readily understandable family context.” Dr. Vicary also would have explained from a medical standpoint, Cunningham’s “violent behavior ... as being intimately and directly related to his chronic and acute substance abuse.”
1. Dr. Vicary’s testimony would not have been duplicative.
The majority concludes that this overwhelmingly mitigating yet excluded testimony would have been duplicative of testimony that was already presented to the jury either by Cunningham personally or his mother. I disagree.
First, the majority is incorrect that Dr. Vicary’s expert opinion that Cunningham suffered from a “chronic underlying depressive mental illness” could have been “easily inferred” by the jury through Cunningham’s own testimony.
The idea that Cunningham in his own trial had the sophistication to articulate his own diagnosis to the jury is completely without merit. There is nothing to suggest that Cunningham was even aware that he suffered from “chronic underlying depressive mental illness.”
Moreover, an expert opinion is very different from a lay opinion, especially a defendant’s opinion. An expert opinion is one from an objective third party that carries an “aura of special reliability and trustworthiness” and bestows upon the jury “appreciable help” in understanding matters with which they are unfamiliar. Amaral, 488 F.2d at 1152; See Ivkovic & Hans, Jurors’ Evaluations of Expert Testimony: Judging the Messenger and the Message, 28 Law & Soc. Inquiry 441, 445 (2003) (noting that the “majority of jurors” who participated in a study “agreed that expert testimony was crucial to the outcome of their cases” (citing Champagne et. al., Expert Witness in the Courts: An Empirical Examination, 76 Judicature 5-10 (1992))). A defendant’s testimony, on the other hand, may be viewed by the jury as a desperate attempt to save himself. In fact, in this case, Cunningham’s counsel conceded during closing arguments that Cunningham did not have much credibility with the jury. His counsel stated: “[Cunningham] would have not much credibility with you. I don’t think he has much credibility with you.”
Here, the majority assumes the jury is informed in the field of psychiatry enough so that it could deduce from Cunningham’s *1169 testimony that “such illness plagued” him. The majority also assumes that the jury gave the same weight to Cunningham’s testimony as it would Dr. Vicary’s testimony. In a case where the result of its affirmation is a death sentence, the majority sadly fails to perceive the impact of its loose assumptions.
Finally, while Cunningham’s counsel and the state prosecutor made Cunningham’s mental health a factor for the jury to consider in deciding Cunningham’s punishment, their arguments could not replace expert mental health testimony. Cunningham’s counsel repeatedly implied during their closing arguments that Cunningham was not mentally sound. Cunningham’s counsel called him “twisted,” “strange,” “crazy,” and “warped.” He said Cunningham’s actions did not “make sense” and that “there’s something wrong” with Cunningham. He stated that Cunningham, in fact, “needed some psychological help at a very early age.” He noted Cunningham took actions that were not justified by “most rational minds.” He further stated that Cunningham had a “problem from the git-go.”
Indeed, the prosecutor even put the question to the jury whether Cunningham suffered from some mental illness that would in some way account for his behavior. In her closing argument, the prosecutor stated that: “Cunningham described himself as being sick. He needs psychiatric help.” She told the jury that Cunningham’s sentencing reports stated that “psychological help” was recommended. She commented that Cunningham himself described that he had been “in and out of psychology in the jail system.” But, she also argued that “[tjhere isn’t a magic pill that makes somebody who is this type of person into the type of person that you are.” She then told the jury moments later, “If this isn’t a case that deserves the death penalty, who does? Who deserves it if this man does not?”
Despite Cunningham’s counsel’s and the prosecutor’s statements that Cunningham had some type of mental deficiency, the jury did not have the benefit of expert testimony to provide direct evidence of such deficiencies. By suggesting a “causal nexus” between Cunningham’s abusive childhood and his crime, expert testimony could have “impacted] the quality and strength of the mitigation evidence” and offered a persuasive explanation of Cunningham’s crimes. State v. Tucker, 215 Ariz. 298, 160 P.3d 177, 201 (2007); see also Douglas v. Woodford, 316 F.3d 1079, 1090 (9th Cir.2003) (holding that counsel’s failure to present expert testimony explaining a possible causal link between defendant’s childhood and his crime was prejudicial). Therefore, the testimony from Dr. Vicary would not be cumulative, but instead highly probative in understanding the effect of Cunningham’s childhood abuse and mental illness on his crimes.
2. There is no evidence in the record that we may consider to conclude that Dr. Vicary’s testimony would have “opened the door to rebuttal.”
The majority concludes that even if Dr. Vicary had presented evidence of Cunningham’s depressive mental illness, such testimony “would have opened the door to rebuttal by a state expert.”
As both parties concede in their supplemental briefs, pursuant to Pin-holster this court can now consider only the evidence that was before the California Supreme Court, including exhibits, declarations, deposition transcripts, and evidentiary hearing testimony first introduced in the district court habeas proceedings. The majority itself recognized that, “we may not *1170 consider evidence raised for the first time during the district court’s eviden-tiary hearing.” The decision in this court must “rest[] solely on the record before the state court.”
The California Supreme Court was only presented with Dr. Vicary’s report and his additional declaration. As described above, Dr. Vicary’s report would not have been duplicative and would have provided valuable insight from a medical perspective to help aid the jury in its weighty decision whether to sentence Cunningham to death. As the Supreme Court recently explained, even where a state expert undermines a defense expert’s conclusions, “it [is] not reasonable to discount entirely the effect that [the expert’s] testimony might have had on the jury.” Porter v. McCollum, 558 U.S. 30, 130 S.Ct. 447, 455, 175 L.Ed.2d 398 (2009) (per curiam).
3. It was prejudicial to exclude Dr. Vicary’s statements.
Even through the “deferential lens of § 2254(d),” there is a reasonable probability that the testimony could have changed at least one juror’s decision. See Pinhol-ster, 131 S.Ct. at 1403.
Dr. Vicary’s testimony would not only have provided insight on Cunningham’s condition at trial, but it would have also helped explain Cunningham’s past behavior and culpability. The Supreme Court has recognized the importance of evidence regarding the defendant’s limited mental capacity for mitigation purposes. Smith v. Texas, 543 U.S. 37, 45, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004); see also Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (“evidence about the defendant’s background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse”).
In addition, under California Penal Code § 190.3, California jurors must consider specific factors in determining whether to sentence a defendant to death, including mental health factors. In Cunningham’s case, three of the eleven factors jurors were instructed to consider directly related to Cunningham’s mental health: 1) “whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance”; 2) whether “at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication”; and 3) a “catch-all” factor, which required the jury to consider:
Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any other sympathetic or other aspect of the defendant’s character or record [that the defendant offers] as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle].
Thus, it became crucial to have an expert corroborate Cunningham’s own testimony that he suffered from a traumatic childhood and some type of mental illness. See Thomas v. Chappell, 678 F.3d 1086, 1105 (9th Cir.2012) (holding that the failure of defense counsel to call a corroborating witness resulted in prejudice to the defendant).
Dr. Vicary noted that as a result of Cunningham’s “chronic underlying depressive mental illness,” Cunningham had difficulty controlling his impulses, had ag *1171 gressive outbursts, and engaged in self-destructive acts. Significantly, Dr. Vicary noted that alcohol was a “major exacerbating factor.” On the night of Treto’s murder, evidence indicates that Cunningham drank at multiple bars. Additionally, evidence exists that Cunningham was under the influence of alcohol during the murder of Ella Mae Fellows. Accordingly, Dr. Vicary’s testimony would have significantly aided the jury in highlighting Cunningham’s mental problems, which may have rendered Cunningham less culpable in the eyes of at least one juror.
The majority relies on Pinholster as instructive, but certain factual differences between Pinholster and this case allow for a more favorable finding for prejudice in this case. In Pinholster, the defendant’s attorneys failed to call any witness other than the defendant’s mother to testify at the penalty phase of his capital case. 131 S.Ct. at 1396. Pinholster’s attorney had previously consulted psychiatrist Dr. John Stalberg who noted Pinholster’s “psychopathic personality traits,” diagnosed him with antisocial personality disorder, and concluded that he “was not under the influence of extreme mental or emotional disturbance” at the time of the murders. Id. In his state habeas petition, Pinholster argued that his attorney was ineffective at the penalty phase of his trial. He submitted a declaration of psychiatrist Dr. George Woods who diagnosed Pinholster with bipolar mood disorder and seizure disorders. Id. Pinholster also included a declaration from Dr. Stalberg who stated that Pinholster’s attorney only provided him with some police reports and a 1978 probation report. Id. Dr. Stalberg testified that had he known about the additional material, he would have conducted “further inquiry” before concluding that Pinholster suffered only from a personality disorder. Id. Dr. Stalberg did not, however, retract his earlier diagnosis.
Pinholster reveled in his criminal history, bragging about being a “professional robber” and explaining that his occupation was that of a “crook.” Id. at 1408, 1405. He also testified that he was a white supremacist and that he frequently carved swastikas into other people’s property as “a sideline to a robbery.” Id. The state presented evidence during the penalty phase that Pinholster had threatened to kill the State’s lead witness, assaulted a man with a straight razor, and kidnapped another person with a knife. Id. at 1408. The Supreme Court ultimately concluded that there was no prejudice in failing to call Dr. Stalberg because there was “no reasonable probability that the additional evidence Pinholster presented in his state habeas proceedings would have changed the jury’s verdict.” Id. at 1408-09.
This case presents a closer call than Pinholster. First, unlike Pinholster, the State in this case possessed less aggravating evidence pertaining to Cunningham. Although the State described Cunningham’s previous crimes, including second degree murder, sodomy, and an assault on a police officer, Cunningham did not display the same callous lack of remorse or desire for crime as Pinholster. Second, Dr. Vicary would not only have discussed a social disorder, but would have also explained that Cunningham suffered from “chronic depressive mental illness” for which alcoholism was a “major exacerbating factor.” This diagnosis would not only provide insight into the crime for which he was sentenced to death, but also explain Cunningham’s mental state during his pri- or convictions. Finally, Pinholster did not concern the failure of counsel to present evidence that would directly address statutory mitigating factors that the jury was required to consider. For these reasons, Dr. Vicary’s expert opinion about Cunningham’s mental health could reasonably have *1172 caused at least one juror to strike a different balance.
IV. Conclusion
Because Cunningham’s attorney failed to call Dr. Vicary, the jury lacked a significant piece of mitigating evidence when it decided to sentence Cunningham to death. Positive and negative factors “might cause a sentencer to determine that a life sentence, rather than death at the hands of the state, is the appropriate punishment for the particular defendant.” Lambright v. Schriro, 490 F.3d 1103, 1115 (9th Cir.2007). The court must “ ‘treat[ ] each defendant in a capital case with that degree of respect due [to] the uniqueness of the individual,’ and determin[e] whether or not he is deserving of execution only after taking his unique life circumstances, disabilities, and traits into account, [as] is constitutionally required.” Id. (quoting Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). As such, “the Constitution requires that ‘the sen-tencer in capital cases must be permitted to consider any relevant mitigating factor.’ ” Porter, 130 S.Ct. at 454-55 (quoting Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)).
In this case, a different result was substantially likely. See Pinholster, 131 S.Ct. at 1403. Cunningham has demonstrated there is a reasonable probability that at least one juror would have struck a different balance because of new evidence provided by Dr. Vicary showing Cunningham’s less culpable mindset. Mitigating mental health evidence from a qualified expert witness holds strong weight in a death penalty sentencing. It should not be brushed off as easily as the majority has done.
Because Cunningham’s counsel’s deficiency deprived the sentencing jury the opportunity to weigh this substantial piece of mitigating evidence, the confidence of Cunningham’s death sentence is sufficiently undermined. Cunningham was prejudiced and the California Supreme Court’s contrary finding was an unreasonable application of Strickland.

. Like the majority, I would affirm the district court's denial of habeas relief on Cunningham's guilt-phase ineffective assistance of counsel claims. Cunningham cannot establish "a reasonable probability that, had the evidence been disclosed to the defense, the result of the [guilt-phase] would have been different.” United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). I also concur in the majority's resolution of Cunningham’s additional non penalty-phase ineffective-assistance claims.